KAB

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William James Mesa, Jr., <br> Plaintiff, <br> v. <br> Charles L. Ryan, et al., <br> Defendants. | No. CV 17-03039-PHX-DGC (MHB) <br><br> **ORDER** |

Plaintiff William James Mesa, Jr., who is currently confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.) The Parties cross-move for summary judgment.[1] (Docs. 21, 25.)

## I. Background

In his Complaint, Plaintiff alleged as follows. In 2007, Plaintiff injured his lower back, and the doctor who saw him created a treatment plan of stretching, losing weight, and purchasing Ibuprofen 200 mg. (Doc. 1 at 5.) In 2014, Plaintiff's condition grew worse, and he collapsed and lost mobility for a short period of time. (*Id.*) Nurse Practitioner (NP) Taylor ordered x-rays and an MRI, insoles for Plaintiff's shoes, and prescribed 300 mg of Gabapentin nightly while awaiting the test results. (*Id.* at 5-6.) In 2016, Plaintiff received his MRI results, which showed a bulging herniated disc and torn discs. (*Id.* at 6.) When Plaintiff submitted a Health Needs Request (HNR) requesting an increase in his

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 23.)

1  Gabapentin, a medical wedge, a new mattress, and shoes, Elijah ordered a blood test to check the levels of Gabapentin in Plaintiff' system due to the Arizona Department of Corrections (ADC) policy to reduce the number of inmates prescribed Gabapentin. (*Id.*) Elijah ignored the laboratory's warning to consider a person's height and weight when reviewing the results, and concluded that the results showed a low level of Gabapentin in Plaintiff's system. (*Id.*) Based on the results, Elijah discontinued Plaintiff's Gabapentin and his pain worsened. (*Id.*) After repeated attempts to have his pain dealt with, Defendant Elijah ignored all requests by Plaintiff for pain management and prescribed stretching, losing weight, and purchasing Ibuprofen 200 mg. (*Id.* at 8.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment claim based on deliberate indifference to serious medical needs against Defendant Dr. Elijah. (Doc. 6.) The Court dismissed the remaining claims and Defendants. (*Id.*) The Parties now cross-move for summary judgment.

**II.  Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Facts[2]

On August 27, 2015, Plaintiff had x-rays of his lumbar spine which showed satisfactory alignment of the vertebral bodies and well-maintained disc spaces, except at L5-S1. (Doc. 22 ¶ 1.) The results showed "[m]inor degenerative joint disease [] in lower lumbar spine and disc degenerative at LS junction." (*Id.*) Thereafter, Plaintiff was diagnosed with lumbago (low back pain) and lumbosacral disc degeneration. (*Id.* ¶ 2.) Plaintiff started receiving an afternoon dose of Gabapentin for low back pain in September 2015. (*Id.* ¶ 3.)

On February 20, 2016, Plaintiff had an MRI of his lumbar spine which revealed "multilevel narrowing of the spinal canal and neural foramina . . . most prominent at L3-4, L4-5, L5-S1[,] annular tears at L4-5 and L5-S1[,] multilevel degenerative changes[, and] Grade 1 retrolisthesis of L5 over S1." (*Id.* ¶ 4; Doc. 22 at 44-46.) Subsequent lumbar x-rays taken on May 26, 2016, revealed the same results as those taken on August 27, 2015—minor degenerative changes in the lower spine and disc degeneration at the LS junction. (*Id.* ¶ 5.)

---

[2] Plaintiff makes various objections to Defendant's asserted facts. (*See generally* Doc. 26.) The Court has considered Plaintiff's objections, but where Defendant has presented evidence supporting the asserted fact, and Plaintiff has failed to controvert the asserted fact with any evidence, the Court has set forth the fact as asserted by Defendant.

1 | Dr. Elijah is employed as a physician by Corizon Health and worked at ASPC-Lewis, Barchey Unit, between September 2016 and April 2017. (*Id.* ¶ 6.) Elijah had two encounters with Plaintiff and both were related to his lower back pain complaints. (*Id.* ¶ 7.)

Prior to meeting with Plaintiff, Elijah reviewed an HNR in which Plaintiff requested an increase in his Gabapentin prescription for chronic back pain. (*Id.* ¶ 18.) Gabapentin is highly regulated in the correctional setting because it is addictive and the potential for abuse, misuse, and diversion is significant. (*Id.* ¶ 19.) As a result, Corizon was carefully monitoring inmate Gabapentin prescriptions, and Elijah was told by several staff members and inmates that Gabapentin was being sold, traded, and given away on the Lewis yard. (*Id.* ¶ 21.) Corizon instituted a practice that inmates on Gabapentin would undergo periodic and random lab tests to ascertain their blood levels of the drug, that levels at or above 2.0 were deemed therapeutic, and that levels below 2.0 were deemed untherapeutic or inadequate. (*Id.* ¶ 22.)

On September 29, 2016, Elijah ordered the Gabapentin serum blood test on Plaintiff, which was taken on September 30, 2016, 20 hours after his last dose. (*Id.* ¶ 23.) At that time, Plaintiff was taking 600 mg of Gabapentin per day. (*Id.* ¶ 24.) Plaintiff's blood level came back as 0.79 and was flagged as "below low normal." (*Id.* ¶ 25.) Elijah opines that given the high dose of Gabapentin and the length of time he was on the medication, Plaintiff's blood levels should have been well within the normal range, but were instead within the non-therapeutic range. (*Id.* ¶¶ 26-27.) As a result, Elijah discontinued Plaintiff's prescription for Gabapentin on October 6, 2016. (*Id.* ¶ 28.)

At the time, Plaintiff had an active prescription for Naproxen, 500 mg, twice daily, to treat his low back pain, and Elijah renewed that prescription on October 17, 2016, which Elijah felt, based on her education, experience, and research, should effectively treat Plaintiff's back pain without the possibility of addiction. (*Id.* ¶¶ 29-31.)

During his visit with Elijah on November 7, 2016, Plaintiff reported that he suffered from chronic back pain as a result of a previous incident in 2007, with an exacerbation in 2015. (*Id.* ¶ 32.) Plaintiff reported that his spine "pops and crackles daily," and that he

experienced intermittent pain with bending and bearing weight, and occasional pain with ambulating. (*Id.* ¶ 33.) Plaintiff complained of pain to his left lateral midline, but exhibited no pain or tenderness upon palpation and reported no interference with his activities of daily living; his straight leg test was negative, and Elijah observed that Plaintiff exhibited normal range of motion and was able to bend and twist freely. (*Id.* ¶¶ 34-37.)

Elijah noted that Plaintiff was clinically obese at 5'8 and 204 pounds. (*Id.* ¶ 38.) She recommended that he lose weight, exercise, and stretch to strengthen his muscles and reduce pressure and tension on the spine; she provided Plaintiff with handouts on spinal conditioning exercises and stretches to perform in his spare time. (*Id.* ¶ 39.) Plaintiff told Elijah that his previous provider, NP Taylor, had considered a neurosurgery consult to review his MRI and determine whether operative management was indicated. (*Id.* ¶ 40.) Elijah sent NP Taylor an email inquiring about the potential neurosurgery consult and her care plan, but did not receive a response. (*Id.* ¶ 41.) Elijah opines that neurosurgery is rarely indicated for chronic back pain unless the patient experiences progressive neurological deficit, inability to carry out activities of daily living, or severe pain that is uncontrolled despite exhausting nonsurgical management options. (*Id.* ¶ 42.)

Elijah opines that based on her education, training, and experience, the best approach to successfully and safely treating low back pain is to teach the patient targeted exercises and stretches he can do to target the source of the pain—as opposed to masking symptoms—and to have the patient make lifestyle changes, such as increased exercise, reduced weight, and reduced smoking. (*Id.* ¶ 13.) Elijah opines that conservative measures are generally preferred for back pain, except in severe cases. (*Id.* ¶ 43.)

Elijah did not see Plaintiff between October 2016 and April 2017. On April 25, 2017, Elijah saw Plaintiff again for a flare-up of back pain complaints, but Plaintiff reported that he was currently without active pain symptoms. (*Id*. ¶ 45.) Plaintiff reported a flare-up of back pain a week before that had resolved on its own and did not report interferences with his activities of daily living. (*Id.* ¶ 47.) Elijah's exam did not reveal any appreciable abnormalities. (*Id.* ¶ 48.) Plaintiff demonstrated a popping and crackling

1 sensation that he experiences in the low back, which he believed indicated his spine was out of alignment, but in Elijah's opinion, the sounds were that of cartilage shifting. (*Id.* ¶ 49.) Elijah prescribed Plaintiff Capsaicin cream, a muscle rub, which is known to be effective in treating joint conditions like osteoarthritis for pain flare-ups. (*Id.* ¶¶ 53-54.) Elijah reiterated that Plaintiff should try to stretch, lose weight, and stay active to reduce or eliminate back pain symptoms. (*Id.* ¶ 55.) Elijah did not have any encounters with Plaintiff after her second visit with him in April 2017, and she did not hear that he was experiencing worsening back pain. (*Id.* ¶ 56.)

**IV.     Discussion**

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett*, 439 F.3d at 1096 (quotations omitted).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment, or by the way prison doctors respond to the prisoner's medical needs. *Estelle*, 429 U.S. at 104-05; *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for a prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Plaintiff saw Elijah two times between October 2016 and April 2017. Elijah admits that she discontinued Plaintiff's Gabapentin, but argues that she based the decision on her medical opinion and did not discontinue the Gabapentin out of deliberate indifference to Plaintiff's serious medical needs. Elijah asserts that Plaintiff's blood test indicated he was not taking the full amount of Gabapentin prescribed to him, that Gabapentin is not normally appropriate to treat chronic back pain like Plaintiff's back pain, and that she believed Plaintiff's back problems could be controlled by stretching, losing weight, staying active, and the other steps that she prescribed. In response, Plaintiff asserts that he had to experience unnecessary and excessive pain because his Gabapentin was discontinued, that there were no allegations made that he misused his Gabapentin, and that Elijah lacked the necessary qualifications to treat lower back pain. (Doc. 26 ¶¶ 58-60.)

Although Plaintiff alleges that Elijah wrongfully discontinued his Gabapentin, the evidence in the record shows that Elijah based her decision on her medical opinion that Gabapentin was not appropriate to treat Plaintiff's condition. Although Plaintiff disagrees with her decision, Plaintiff introduces no evidence demonstrating that the decision was unreasonable or was deliberately indifferent to his serious medical needs. Rather, Elijah

recommended a conservative treatment plan for Plaintiff, and Plaintiff has not introduced any evidence that the treatment plan was inappropriate.

Nothing in the records of Plaintiff's visits to Elijah demonstrate that she was deliberately indifferent to his serious medical needs. Although Plaintiff would have preferred to remain on Gabapentin, there is no evidence in this record that Elijah's decision to discontinue Gabapentin was based on improper reasons outside of her medical opinion. Moreover, although Elijah did not follow-up after e-mailing NP Taylor about Plaintiff, she did not believe a neurosurgery consult was clinically indicated, and the failure to follow up shows negligence at best, not that her failure to follow up was based on deliberate indifference to Plaintiff's serious medical needs. Summary judgment will be granted in favor of Elijah because, on this record, there is no evidence that Elijah was deliberately indifferent to Plaintiff's serious medical needs.[3]

**IT IS ORDERED:**

(1) Reference to the Magistrate Judge is withdrawn on Defendant's Motion for Summary Judgment (Doc. 21) and Plaintiff's Cross-Motion (Doc. 25).

(2) Defendant's Motion for Summary Judgment (Doc. 21) is **granted**.

(3) Plaintiff's Cross-Motion for Summary Judgment (Doc. 25) is **denied**.

(4) The Clerk of Court must enter judgment accordingly.

Dated this 12th day of February, 2019.

*David G. Campbell*
_____
David G. Campbell
Senior United States District Judge

---

[3] After briefing on summary judgment, Plaintiff submitted a "Supplemental Reply" in which he claims that on September 17, 2018, his back went out and, in response to a request for a long-term plan of action, he was told Corizon was "checking on referral." (Doc. 28.) Plaintiff does not include any allegations against Defendant Elijah, the only Defendant to this action. The Court, therefore, does not consider this document part of the summary judgment briefing. To the extent Plaintiff has new claims based on his current medical complaints, he must file a new complaint in a new action.